UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHRIS D. CUNNINGHAM, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>REA MAGNET WIRE COMPANY, INC., )<br>)<br>Defendant. ) | CAUSE NO. 1:21-cv-00120-SLC |

## OPINION AND ORDER

Plaintiff Chris D. Cunningham filed this age discrimination case against his former employer, Defendant Rea Magnet Wire Company ("Rea"), on March 15, 2021, alleging that it discriminated against him based on his age in connection with the termination of his employment in November 2019.[1]  (ECF 7).  Specifically, Cunningham, who was 57 years old at the time, claims that Rea discriminated against him when it failed to offer him the open hourly job of Group Leader-Shipping—the duties of which he claims he had been performing for the past twenty months—after eliminating his salaried position as Distribution Supervisor, and hired a "young female intern . . . believed to be 28 to 30 years old" for the Group Leader-Shipping position instead.  (ECF 7 ¶¶ 1, 10; *see* ECF 26).

Rea filed a motion for summary judgment, together with a supporting brief and evidence, on January 18, 2022, asserting that no reasonable jury could conclude that Rea discriminated against Cunningham when it otherwise filled the Group Leader–Shipping position, given that

___
[1] Subject matter jurisdiction under 28 U.S.C. § 1331 is proper in this Court.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  (ECF 11).

Cunningham never applied for the job.[2] (ECF 15-16). Cunningham filed a response with supporting evidence on March 21, 2022 (ECF 21), and Rea timely replied (ECF 22), offering an additional affidavit in support (ECF 22-1).[3] With the Court's leave (ECF 26), Cunningham filed a sur-response (ECF 27)[4] and Rea filed a sur-reply (ECF 28), making the motion ripe for ruling. For the following reasons, Rea's summary judgment motion will be GRANTED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[5]

### A. *In March 2007, Rea Hires Cunningham to Work Under Foster*

In March 2007, Rea, a manufacturer, hired Cunningham as a Distribution Supervisor—a salaried position—at its plant in New Haven, Indiana.[6] (ECF 15-1 ¶ 4.b; ECF 15-2 at 6, 8-11,

---

[2] Cunningham also alleged in his complaint that Rea discriminated against him based on his age by consolidating his position as Distribution Supervisor with that of the Purchasing Manager and giving the newly consolidated position to the Purchasing Manager, who Rea claims was more qualified than Cunningham. (ECF 7). But after Rea moved for summary judgment asserting that no reasonable jury could conclude that Rea's proffered explanation for retaining the Purchasing Manager, who was thirteen months older than Cunningham, was dishonest, Cunningham conceded this claim at the outset of his response brief. (ECF 21 at 1).

[3] In Rea's reply brief, in addition to arguing that Cunningham never applied for the Group Leader-Shipping position, Rea asserts that Cunningham had only pled a wrongful termination claim based on Rea's retaining the Purchasing Supervisor over him, and that it was "too late" to assert a failure-to-hire claim based on the Group Leader-Shipping position. (ECF 22). In response, Cunningham filed a motion to strike the reply brief, or in the alternative, leave to file a sur-response, on the grounds that Rea's reply brief introduced new evidence and new arguments. (ECF 23, 24). Rea timely filed a response to the motion to strike (ECF 25), and Cunningham opted not to reply. On June 22, 2022, the Court denied Cunningham's motion to strike, but granted his requested alternative relief of leave to file a sur-response to the summary judgment motion. (ECF 26). In doing so, the Court concluded that Cunningham had adequately pled an age discrimination claim based on Rea's failure to offer him the Group Leader-Shipping job. (*Id.* at 3-4). To give Rea the last word on its summary judgment motion, the Court *sua sponte* afforded Rea leave to file a sur-reply. (*Id.* at 5).

[4] Curiously, despite the Court's Order on the motion to strike finding that Cunningham had adequately pled an age discrimination claim based on Rea's failure to offer him the Group Leader-Shipping job (ECF 26), Cunningham spends eight pages of his nine-page sur-response brief arguing that he sufficiently pled this claim (ECF 27).

[5] For summary judgment purposes, the facts are recited in the light most favorable to Cunningham, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[6] Cunningham's application said that he was applying for the position of Warehouse Supervisor, but Rea's Human Resources Department listed his official title as Distribution Supervisor. (ECF 15-2 at 54, 61-63). The

2

54, 61). Ronald Foster, Rea's Materials and Distribution Manager, had worked for Rea since 1996 and served as Cunningham's direct supervisor. (ECF 15-1 ¶ 4.a; ECF 15-2 at 8, 13-14, 18-19).

### B. In March 2016, Rea Divides the Purchasing and Distribution Functions

In March 2016, Rea decided to reorganize its supply chain operations at the New Haven plant to completely divide the purchasing and distribution functions under two separate supervisor positions. (ECF 15-1 ¶ 4.c; ECF 15-2 at 14-15, 63). Foster became the Purchasing Manager over only the purchasing function, and Cunningham remained Distribution Supervisor but with additional management duties over that department.[7] (ECF 15-1 ¶ 4.c; ECF 15-2 at 14-15, 18, 63). Foster and Cunningham each reported directly to the Supply Chain Manager for the duration of Cunningham's employment. (ECF 15-1 ¶ 4.c; ECF 15-2 at 15, 18, 64). As Distribution Supervisor, Cunningham supervised approximately five to seven hourly employees—consisting of Material Handlers and one Group Leader-Shipping—who were represented by a union. (ECF 15-2 at 19). Throughout his entire employment with Rea, Cunningham was an exempt, salaried employee and was never a member of a union. (ECF 15-1 ¶ 4.b; ECF 15-2 at 10-11).

### C. In March 2018, Rea Creates the Group Leader-Shipping Position

In March 2018, Rea created the hourly position of Group Leader-Shipping at the New

---

parties do not dispute that these titles were synonymous. (ECF 16 at 3 n.1; ECF 21 at 4). For ease, the Court will refer to Cunningham's former position as "Distribution Supervisor" herein.

[7] Cunningham claims that when he got this "promotion," his title changed to "Warehouse Manager." (ECF 15-2 at 16, 19). However, his personnel records do not reflect this change because Human Resources concluded that his title needed to be consistent with a comparable role at other Rea plants, which was "Distribution Supervisor." (*Id.* at 17). As stated earlier, this discrepancy of job title is not material to the outcome here.

Haven plant. (ECF 22-1 ¶ 4.a). Jeff Kline became the Group Leader-Shipping when it was created. (*Id.*).

### D. In March 2018, Cunningham Absorbs the Duties of Shipping Coordinator After Rea Fails to Fill the Vacancy

Also in March 2018, Cunningham began performing the duties of the Shipping Coordinator after that employee took another job within the plant and Rea did not fill the position. (ECF 15-2 at 33-34). The Shipping Coordinator was the same as the Group Leader-Shipping position, except that the Shipping Coordinator job involved supervision. (*Id.*). Cunningham testified that his "management duties went away pretty much in March . . . 2018," as he started spending most of his time behind a desk and "maybe 10 percent on the shipping floor." (*Id.* at 38). He explained: "There's no way I could supervise my employees on the shipping floor if I never went out to the shipping floor." (*Id.*). Before March 2018, when he still had a Shipping Coordinator, Cunningham would spend "maybe 70, 80 percent of [his] day out on the shipping floor." (*Id.*). During his deposition, Cunningham specifically stated that in the last few years of his employment, he "was not doing the Group Leader job."[8] (ECF 15-2 at 34).

In September 2018, Cunningham began reporting to Joe Haupert, Supply Chain Manager. (ECF 21-2 at 3-4, 6). In Cunningham's February 28, 2019, annual review, Haupert wrote: "Shipping clerk is needed. [Cunningham] has not managed the warehouse for 2 years now once the help was pulled. [Cunningham] is doing far to[o] much secretarial work." (ECF 21-3 at 4).

---

[8] Cunningham claims just the opposite in his affidavit—that despite his title as Distribution Supervisor he *was* doing the Group Leader-Shipping job for the last few years of his employment. (ECF 21-5 ¶ 3). However, "[i]t is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Cooper v. Eaton Corp.*, 498 F. Supp. 3d 1053, 1069 (N.D. Ind. 2020) (quoting *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir. 1988)). Therefore, this portion of Cunningham's affidavit cannot be credited.

Haupert further noted that Cunningham "[w]as hired to be a warehouse supervisor[], but with departure of clerks, ha[s] not been able to focus on job duties." (*Id.* at 4). Haupert's opinion was that Rea needed to "free [Cunningham] up to manage the warehouse vs. have him be a secretary." (*Id.* at 6).

### E. On October 30, 2019, Kline Accepts a New Position and the Next Day Rea Internally Posts the Group Leader-Shipping Open Position

In the fall of 2019, Kline was still the hourly Group Leader-Shipping under Cunningham. (ECF 15-1 ¶ 4.h; ECF 15-2 at 34-35). However, on October 30, 2019, Kline accepted a Production Supervisor position, which would start in January 2020. (ECF 15-1 ¶ 4.h). Given Kline's acceptance, Rea posted the Group Leader-Shipping open position internally on November 1, 2019. (ECF 15-1 ¶ 4.i; ECF 21-5 ¶ 8; ECF 21-7 at 3). The internal posting stated that the bid would be "taken down" on November 4, 2019. (ECF 21-7 at 3). Three internal candidates bid on the job when the posting went up. (*Id.*). The record is silent as to why none of them were selected for the position. (*See* ECF 22-1 ¶ 4.c).

### F. In November 2019, Rea Consolidates the Purchasing and Distribution Functions Again

In November 2019, Rea management—specifically, General Manager, Diversified Operations John McKibben; Plant Manager Patrick Patterson; Vice President of Human Resources Susan Boyd; and Human Resources Manager Suzi Eberle—decided to eliminate a salaried position at the New Haven plant to address fixed costs due to business conditions resulting in declining sales. (ECF 15-1 ¶ 4.e; ECF 21-6 at 5). Rea determined it could again consolidate oversight of both the purchasing and distribution functions into a single position as a means of eliminating one salaried position. (ECF 15-2 ¶ 4.e).

Rea states that it deemed Foster the better fit for the consolidated position because he had

5

previously held the Materials and Distribution Manager position responsible for both functions, where Cunningham had no purchasing experience. (*Id.*; ECF 15-2 at 31). Also, Foster had been employed by Rea about eleven years longer than Cunningham and had been Cunningham's supervisor for several years prior to 2016.[9] (ECF 15-1 ¶ 4.e). Therefore, Rea decided to eliminate Cunningham's position. (*Id.*; ECF 15-2 at 23, 71).

### G. On November 12, 2019, Rea Terminates Cunningham

On November 12, 2019, Cunningham was informed orally and by letter of the termination of his employment.[10] (ECF 15-1 ¶ 4.e; ECF 15-2 at 34, 71). At the meeting in which he was terminated, Cunningham asked Haupert and Eberle who was going to take his position, and he was told that Rea was "going to split it up between a Group Leader and Ron Foster." (ECF 15-2 at 25). More specifically, Cunningham was told that Foster was going to take over the supervisory part of it, and the Group Leader-Shipping would perform the duties that Cunningham had been performing the last twenty months. (ECF 21-5 ¶ 4).

Rea, however, did not offer Cunningham the Group Leader-Shipping position in connection with his termination. (*Id.* ¶ 5). Nor did Cunningham apply for the Group Leader-Shipping position after he learned of his termination on November 12, even though he knew there was a Group Leader-Shipping opening. (ECF 15-1 ¶ 4.i; ECF 15-2 at 35; ECF 21-5 ¶ 9). When asked why not, Cunningham attests:

---

[9] Cunningham testified that he believed he was "equally qualified" for the consolidated position given that he had more experience in the shipping department than Foster and "could do every job in the office," but he conceded that Rea viewed Foster as more qualified than him. (ECF 15-2 at 32).

[10] Before the consolidation, Cunningham was over the distribution function, assisted by an hourly Group Leader-Shipping, and Foster was over the purchasing function. (ECF 15-1 ¶ 4.g). After the consolidation, Foster was over both the purchasing and distribution functions, assisted by an hourly Group Leader-Shipping. Consequently, there was one less salaried position at the New Haven plant. (*Id.*).

> At the time I was terminated on November 12, 2019, I did not apply for the opening because I didn't know it had been posted or if it had been filled or not and it would have made no sense to me to apply for that position when I had been performing the job for the last twenty (20) months and . . . Rea . . . fired me and did not offer me the open position."

(ECF 21-5 ¶ 9).

On November 26, 2019, Cunningham's counsel sent a letter to Rea, informing it that Cunningham was not willing to sign the Confidential Severance Agreement Waiver and General Release presented to him by Rea on November 12, 2019. (ECF 21-13 at 3). The letter further informed Rea that it was Cunningham's "intention to pursue a Charge of Age Discrimination with the EEOC and through the federal courts if a satisfactory agreement cannot be worked out." (*Id.*). Rea responded by letter on December 4, 2019, denying Cunningham's allegations of age discrimination and affirming its position that it had provided him with a reasonable separation package. (*Id.* at 4).

*H. On December 4, 2019, Rea Externally Posts the Group Leader-Shipping Open Position*

On December 4, 2019, Rea posted the Group Leader-Shipping open position externally on Indeed.com and other external job listing services.[11] (ECF 15-1 ¶ 4.i). Cunningham saw the external job posting on Indeed.com, but did not apply for the position. (*Id.* ¶ 4.j; ECF 15-2 at 36). When asked why not, he stated: "Because I was just let go from [Rea]. If I wasn't going to be offered that position at [the time my Distribution Supervisor position was eliminated], I'm not sure I would have been hired at this time." (ECF 15-2 at 36).

---

[11] Rea states that "a new and inexperienced HR Generalist was using a new ADP recruiting tool and incorrectly copied the wrong job description content into the external posting," so the posted job description erroneously included management responsibilities. (ECF 15-1 ¶ 4.i). Rea explains that the Group Leader-Shipping is a "non-exempt hourly union position and is not permitted under the union contract to perform management functions." (*Id.*). Rea claims it then issued a corrected job description internally on January 1, 2020. (*Id.*).

*I. On December 19, 2019, Rea Hires Harnish as the Group Leader-Shipping*

In December 2019, Kinley Harnish was 28 to 30 years old and a supply chain intern with Rea, having started her internship six months earlier. (ECF 21-5 ¶ 6; ECF 21-10 at 5). On December 18, 2019, Haupert sent an email to Foster, Eberle, and Patterson, stating: "FYI... Kinley said that she would like to be considered for the shipping group lead role what steps do we need to take next?" (ECF 21-11). The next day, December 19, 2019, Harnish submitted her application for the Group Leader-Shipping position and she was offered the job that same day, with an effective date of January 2, 2020. (ECF 15-1 ¶ 4.j; ECF 21-5 ¶ 6; ECF 21-10).

Also on December 19, 2019, Eberle wrote in an email to Haupert, copying Patterson: "To cover all our bases, Kinley will need to take the test you gave to all candidates. She said [s]he can take it tomorrow. Can you arrange this and let me know how she did. We will put her through new hire orientation on 1/3. . . . On Jan 2, she can sit with Jeff." (ECF 21-12; *see* ECF 22-1 ¶ 4.e). Harnish took and passed the test the next day. (ECF 22-1 ¶ 4.e). Rea states that Haupert made the decision to hire Harnish (ECF 21-6 at 6-7), but Patterson and Eberle were obviously aware of the decision at the time.

By the time Harnish expressed interest in the Group Leader-Shipping position on December 18, 2022, fifteen external candidates and three internal candidates had applied for the position.[12] (ECF 21-9). Rea claims that these other applicants "had already been ruled out" by December 18 (ECF 22-1 ¶ 4.d), though the record is silent as to why.

The hourly Group Leader-Shipping position paid $21.37 per hour, which equates to about

---

[12] Although Rea states in its brief that sixteen external candidates applied for the position (ECF 22 at 6), it appears that one candidate's name on the candidate list ("Rachel Pasha") is listed twice (ECF 21-9 at 3).

8

$44,450 annually.  (ECF 15-2 at 35).  Cunningham was earning an annual salary of about $81,490 when his Distribution Supervisor position was eliminated.  (*Id.* at 27).  Rea does not dispute that throughout his entire employment with Rea, Cunningham "performed [his] job satisfactorily at or above [Rea's] expectations, received good Annual Reviews, and was never written up or disciplined for any performance issues."  (ECF 21-5 ¶ 7).  Cunningham testified that had the hourly Group Leader-Shipping position been offered to him at the time of his termination, he would have accepted the job.  (ECF 21-2 at 20).

## II.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.* (citations omitted).  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted.  *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants."  *Id.* (citations omitted).  However, "a party opposing summary judgment may not rest on the

pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### III.  DISCUSSION

#### A.  Applicable Law

The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, protects workers forty years of age and older, "making it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (citations and internal quotation marks omitted). "The ADEA prohibits disparate treatment, where liability depends on whether the protected trait . . . actually motivated the employer's [adverse] decision." *Id.* (alterations in original) (citation and internal quotation marks omitted).

In order to recover under a theory of disparate treatment in the ADEA context, a plaintiff "must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action." *Id.* (citation omitted); *see also Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). That is, "it's not enough to show that age was a motivating factor. The plaintiff must prove that, but for [his] age, the adverse action would not have occurred." *Marnocha*, 986 F.3d at 718 (citation and internal quotation marks omitted).

"A plaintiff may prove but-for causation either 'by introducing direct or circumstantial evidence that [his] employer took an adverse action against [him] because of [his] age' or by invoking the burden-shifting framework set forth in *McDonnell Douglas* . . . ." *Id.* (citation

10

omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  The *McDonnell Douglas* framework requires a plaintiff establish that: "(1) [he] is a member of a protected class, (2) [he] was meeting the defendant's legitimate expectations, (3) [he] suffered an adverse employment action, and (4) similarly situated employees who were not members of [his] protected class were treated more favorably."  *Id.* at 718-19 (citation omitted); *see also Lewis*, 36 F.4th at 759.

"The Seventh Circuit has adjusted the fourth element depending on factual circumstances of a given case."  *Weide v. Swiss Re Life & Health Am., Inc.*, No. 1:07 CV 328, 2010 WL 3927591, at *5 (N.D. Ind. Oct. 1, 2010).  "In a termination case, the fourth element of the plaintiff's prima facie case is that the employer sought someone else to perform the same work."  *Id.*  In a failure-to-hire case, the fourth element is whether "a similarly situated person outside his protected class was hired for the position instead, or the position remained open."  *Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015); *see also Malone v. City of Terre Haute*, No. 2:14-cv-331-JMS-DKL, 2015 WL 9094303, at *5 (S.D. Ind. Dec. 15, 2015).  "When an employee's position is eliminated as part of a mini-reduction in force ('mini-RIF'), the fourth element of the prima facie case becomes whether the employee's duties were absorbed by workers outside [his] protected class."  *Lewis*, 36 F.4th at 759-60; *see also Filar v. Bd. of City of Chi.*, 526 F.3d 1054, 1060 (7th Cir. 2008).  "The point of the mini-RIF, unlike a true RIF, is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively 'replaced,' not eliminated."  *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000).

"If the plaintiff establishes this prima facie case, the burden shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Marnocha*, 986 F.3d at 718 (citation and internal quotation marks omitted); *see also Lewis*, 36 F.4th at 760.  To show pretext, a plaintiff "must present evidence suggesting the employer's proffered reason . . . [is] a lie." *Marnocha*, 986 F.3d at 721 (alterations in original) (citation and internal quotation marks omitted).  To do so, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Id.* (citation and internal quotation marks omitted).

"Regardless of which path to proof a plaintiff takes, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* [his] age." *Id.* at 719 (citation omitted).  That is, "courts must assess the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself, regardless of whether the court also analyzes the evidence pursuant to *McDonnell Douglas*." *Lewis*, 36 F.4th at 760 (citation and internal quotation marks omitted).

### B.  Cunningham Establishes a Prima Facie Case

Cunningham easily establishes the first three elements of a prima facie case of age discrimination.  He is more than forty years old, Rea does not dispute that he was meeting its legitimate expectations, and his termination constituted an adverse employment action.  The fourth element, however, requires more discussion.  As explained earlier, in a termination case the fourth element of a plaintiff's prima facie case is that "the employer sought someone else to

perform the same work." *Weide*, 2010 WL 3927591, at *5. However, when an employee's job is eliminated as part of a mini-RIF, the fourth element becomes "whether the employee's duties were absorbed by workers outside [his] protected class." *Lewis*, 36 F.4th at 759.

With respect to his supervisory duties as Distribution Supervisor, Cunningham concedes that he cannot establish the fourth element given that his supervisory duties were absorbed by Foster, who is one year older than him. (ECF 21 at 1). Consequently, Cunningham has abandoned any claim of age discrimination based on the retention of Foster over him for the newly consolidated Purchasing and Distribution Supervisor job. Cunningham claims, however, that in eliminating his salaried Distribution Supervisor position, Rea discriminated against him based on his age when it failed to offer him the hourly Group Leader-Shipping job and instead hired Harnish for the position, an intern more than 25 years younger than him. (*Id.* at 1-3).

During his termination meeting with Haupert and Eberle, Cunningham asked them who was going to take his job, and they responded that they "were going to split it up between a Group Leader and Ron Foster." (ECF 15-2 at 25). More specifically, Cunningham was told that Foster was going to take over the supervisory part of it, and the Group Leader-Shipping would perform the duties that Cunningham had been performing the last twenty months. (ECF 21-5 ¶ 4).

At the time of Cunningham's termination then, it was Kline who absorbed the non-supervisory portion of Cunningham's duties, at least for the first two months.[13] But because Kline was moving to another position in January 2020, his position as Group Leader-Shipping was open at the time of Cunningham's termination. Ultimately, Rea hired Harnish for that job

---

[13] The record does not reveal Kline's age.

13

on December 19, 2019.  Harnish was about 28 to 30 years old, and thus outside of Cunningham's protected class.  Consequently, Cunningham has established a prima facie case of age discrimination as to the non-supervisory portion of his duties that were absorbed by Harnish.

### B. *Rea Articulates a Legitimate, Nondiscriminatory Reason for Failing to Offer Cunningham the Group Leader-Shipping Position*

After a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Marnocha*, 986 F.3d at 719 (citation omitted); *see also Lewis*, 36 F.4th at 760.  Here, Rea explains that its four decision makers on Cunningham's termination—McKibben, Patterson, Boyd, and Eberle—decided that "it needed to eliminate a salaried position at the facility due to declining sales and that it would do so by consolidating management over the purchasing and distribution functions under one supervisor," and that it would retain Foster over Cunningham because Foster was more qualified.  (ECF 16 at 1).  As stated earlier, Cunningham no longer challenges Rea's reason for deciding to retain Foster over him.

As to the Group Leader-Shipping position, Rea states that these four decision makers "were not aware Cunningham had allegedly stopped performing management duties," and thus they "had no reason to believe he would be interested in the Group Leader-Shipping opening." (ECF 22 at 4 (citing ECF 15-1 ¶¶ 4.e, 5)).  Rea points out that throughout Cunningham's employment with Rea he always held a salaried position, was never a member of the union, and his title at the time of his termination was Distribution Supervisor.  (*Id.* at 2 (citing ECF 15-1 ¶ 4.b; ECF 15-2 at 10-11)).  As far as the decision makers knew, Kline had held the position of Group Leader-Shipping—an hourly, union-represented job—since March 2018, not Cunningham.  (ECF 15-1 ¶¶ 4.b, 4.d, 4.h; ECF 15-2 at 34-35; ECF 22-1 ¶ 4.a).

14

Rea further explains that because the Group Leader-Shipping position is an hourly position that is part of the collective bargaining unit, Rea "was required to post the job" and "could not have just unilaterally given the Group Leader-Shipping job to anyone." (ECF 22-1 ¶ 5). As Rea succinctly states: "Cunningham never applied for the position, so he was not considered for it." (*Id.*). As such, Rea has identified legitimate, nondiscriminatory reasons for not offering the Group Leader-Shipping job to Cunningham—that is, the decision makers who terminated him had no reason to know he would be interested in the hourly job, Rea could not just offer the job to anyone because it was required to post the position as part of the collective bargaining unit, and Cunningham never applied for the job.

### C. Cunningham Fails to Establish That Rea's Reasons Were Pretextual

Once the defendant has established a legitimate, non-discriminatory reason for the adverse employment action, "the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Marnocha*, 986 F.3d at 719 (citation omitted); *see also Lewis*, 36 F.4th at 760. Thus, to avoid summary judgment, Cunningham must identify "weaknesses, implausibilities, inconsistencies, or contradictions in [Rea's] asserted reasons that a reasonable person could find it unworthy of credence." *Marnocha*, 986 F.3d at 721 (citation and internal quotation marks omitted).

In an effort to establish pretext, Cunningham argues that Rea management "was aware [he] was performing the Group Leader-Shipping job as it made the decision to not fill it and someone had to perform the duties." (ECF 21 at 2). Further, he states that Haupert "expressly stated in [his 2108 Annual] Review that Cunningham was doing the shipping clerk job and had not managed the warehouse since Rea did not fill the position." (*Id.*). But in making this

15

argument, Cunningham glosses over certain facts of record.

First, Haupert did not expressly state in his 2018 annual review that Cunningham "was doing the shipping clerk job and had not managed the warehouse since Rea did not fill the position." (*Id.*). More precisely, Haupert wrote that Cunningham "has not managed the warehouse for 2 years now," was "doing far to[o] much secretarial work," and that a "[s]hipping clerk is needed." (ECF 21-3 at 4). Thus, Haupert never mentioned the Group Leader-Shipping job in Cunningham's review.

Further, while Cunningham argues in his brief and states in his affidavit that he had been performing the Group Leader-Shipping job since March 2018 (ECF 21 at 2; ECF 21-5 ¶ 3), this directly contradicts his deposition testimony stating that he "was *not* doing the Group Leader[-Shipping] job" (ECF 15-2 at 34 (emphasis added)). Cunningham testified, rather, that he had been performing the duties of "Shipping Coordinator" since 2018 when an employee left that job and Rea chose not to fill the position.[14] (ECF 15-2 at 33-34). Further, it is undisputed that Kline held the position of Group Leader-Shipping from March 2018 through January 1, 2020, and that there was only one Group Leader-Shipping job in Cunningham's department. (ECF 15-2 at 19-20, 34-35).

As already stated, "a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Cooper*, 498 F. Supp. 3d at 1069 (citation omitted). As such, the Court cannot credit Cunningham's claim that he was doing the Group Leader-Shipping job in the

---

[14] Cunningham testified that while the "Shipping Coordinator and the Group Leader jobs are, basically, the same," the Shipping Coordinator job involved supervision, and the Group Leader-Shipping job did not. (ECF 15-2 at 33-34).

16

twenty months leading up to his termination. Rather, the credited facts of record reflect that Cunningham absorbed the duties of the Shipping Coordinator in March 2018, and that Kline was performing the Group Leader-Shipping job from March 2018 to January 2020.

Most significantly, is undisputed that Cunningham never applied for the hourly Group Leader-Shipping job even though he knew it was an open position at the time of his termination, and he later saw the external posting for the job on Indeed.com. (ECF 21-2 at 12, 19). Nor does Cunningham dispute Rea's statement that because the Group Leader-Shipping position was an hourly job that is part of the collective bargaining unit, Rea was required to post the job and could not have just unilaterally given it to anyone. In fact, unlike Harnish, Cunningham never expressed interest to Haupert—or anyone else for that matter—about wanting to be considered for the Group Leader-Shipping open position.

Indeed, Cunningham's assertion that Rea rejected the eighteen candidates who actually applied for the Group Leader-Shipping position and that his applying for the job "would have been futile" because Rea "clearly wanted the much younger person to get it" is mere speculation. (ECF 21 at 17 ("It appears [Rea] just waited a bit and then, why they thought the time was right, they hired young Kinley Harnish for the job.")). But "[c]onjecture or speculation regarding the employer's motives cannot be used to defeat a summary judgment motion." *Carson v. Witt*, No. 1:17-CV-486-HAB, 2020 WL 1139406, at *6 (N.D. Ind. Mar. 9, 2020) (citation and internal quotation marks omitted). Cunningham does not offer any evidence about the ages of the eighteen other candidates or the reasons why they were rejected. "[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325

F.3d 892, 901 (7th Cir. 2003) (citation and internal quotation marks omitted).

The only evidence that Cunningham points to in an attempt to show Rea's alleged nefarious intent is that: (1) Rea hired Harnish before she took the necessary employment test, and (2) Eberle's December 19, 2019, email to Haupert, stating: "*To cover all our bases*, Kinley will need to take the test you gave to all candidates. . . ." (ECF 21 at 10-11 (emphasis added) (citing ECF 21-12)); *see also* ECF 21 at 17-19; ECF 22-1 ¶ 4.e). Cunningham claims that this evidence reveals that "Rea . . . had its mind made up that young Kinley Harnish was going to get this job even without knowing she could pass the test." (ECF 21 at 11).

But in reply, Rea submits Eberle's affidavit, explaining that by the time Harnish expressed interest in the Group Leader-Shipping position on December 18, 2019, all of the other candidates who had applied for the position had already been ruled out. (ECF 22-1 ¶ 4.d). Eberle further attests that "[h]ad Harnish not passed the test then she would not have been hired," as Harnish's "official hire date as Group Leader-Shipping was January 2, 2020." (ECF 22-1 ¶ 4.e).

It is true that Harnish's hiring process moved quickly. Indeed, Eberle's words "[t]o cover all our bases . . . ." in her December 19, 2019, email seem to reflect that. But that is not entirely surprising given that Harnish had already been serving as a supply chain intern for Rea for the past six months, and all of the other candidates who had applied for the Group Leader-Shipping job had already been ruled out. More importantly, in contrast to Harnish, there is *no* evidence that Cunningham ever applied for, or expressed any interest in, the Group Leader-Shipping open position. As such, the speediness of Harnish's hiring is not a reasonable basis upon which to conclude that Rea discriminated against Cunningham on the basis of his age in the Group

Leader-Shipping hiring process.  *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2006) ("[A]ll evidence belongs in a single pile and must be evaluated as a whole.  That conclusion is consistent with *McDonnell Douglas* and its successors.").

In sum, Cunningham has failed to point to evidence from which a reasonable jury could conclude that Rea's stated reasons for failing to offer him the Group Leader-Shipping position and hiring Harnish for the job were "phony" or a "lie."  *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995); *Mobley v. Wick-Fab, Inc.*, 1:17-cv-485, 2019 WL 2103437, at *6 (N.D. Ind. May 13, 2019).  Further, a reasonable jury when viewing the record "as a whole" and in the light most favorable to Cunningham, and affording him all reasonable inferences, could not conclude that Cunningham would have been offered the Group Leader-Shipping job "but-for" his age.  *See Marnocha*, 986 F.3d at 719 ("Regardless of which path to proof a plaintiff takes, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* [his] age." (citation omitted)); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) ("To establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision.").  Consequently, Rea's motion for summary judgment will be GRANTED.

### IV.  CONCLUSION

For the foregoing reasons, Rea's motion for summary judgment (ECF 15) is GRANTED.  The Clerk is DIRECTED to enter a judgment in favor of Rea and against Cunningham.

SO ORDERED.  Entered this 25th day of August 2022.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge